# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 18, 2003

## STATE OF TENNESSEE v. GERALD L. "PETE" SHIRLEY

**Direct Appeal from the Criminal Court for Scott County**
**No. 7583      E. Shayne Sexton, Judge**

---

**No. E2002-03096-CCA-R3-CD**
**January 7, 2004**

---

A Scott County jury convicted the Defendant, Gerald L. "Pete" Shirley, of especially aggravated kidnapping, one count of aggravated sexual battery, five counts of aggravated rape, one count of aggravated assault as a lesser-included offense of attempted second degree murder, and another count of aggravated assault. The trial court imposed an aggregate sentence of sixty years in prison. On appeal, the Defendant contends the following: (1) the trial court erred in permitting the jury to take the "bill of particulars" into the jury room during deliberations; (2) the Defendant's convictions for aggravated rape by digital penetration and aggravated rape by oral sex violate the principles of double jeopardy and duplicity of offenses; (3) the trial court erred in failing to dismiss or merge the especially aggravated kidnapping conviction into one of the aggravated rape convictions; (4) the trial court erred in refusing to permit the jury to review a copy of the statement that the victim gave to a police officer; (5) the trial court erred in failing to instruct on the lesser-included offense of false imprisonment; (6) insufficient evidence exists to support the convictions; and (7) the trial court erred in sentencing the Defendant to an effective sixty-year sentence. After thoroughly reviewing the record, we conclude that the trial court committed plain error by instructing the jury that aggravated assault was a lesser included-offense of attempted second degree murder. Accordingly, we reverse the Defendant's conviction of aggravated assault in count eleven of the indictment and modify his sentence to an aggregate fifty years in prison. We affirm the Defendant's remaining convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed in Part, Affirmed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Julie A. Rice, Knoxville, Tennessee, for the appellant, Gerald L. Shirley.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; David H. Findley, Assistant Attorney General; William Paul Phillips, District Attorney General; John W. Galloway, Jr., and Lori Ann Phillips-Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from the kidnapping, rape and shooting of C.B.[1] ("victim") on August 17, 1999, near a strip mine off Kingtown Road near the town of Winfield in Scott County. The Scott County Grand Jury indicted the Defendant, Gerald L. "Pete" Shirley, on one count of especially aggravated kidnapping, one count of aggravated sexual battery, eight counts of aggravated rape, one count of attempted second degree murder, and one count of aggravated assault. Following a trial on July 26, 2000, in the Scott County Criminal Court, a jury convicted the Defendant of especially aggravated kidnapping, five counts of aggravated rape, one count of aggravated sexual battery, one count of aggravated assault as a lesser-included offense of attempted second-degree murder, and another count of aggravated assault. The trial court subsequently imposed an aggregate sentence of sixty years in prison. The Defendant now appeals.

The following evidence was presented at the Defendant's trial. The victim testified that she lived in McCreary County, Kentucky, all her life and that, on August 16, 1999, at 5:00 p.m., she went to her cousin Sandy Brown's house in McCreary County to watch Brown's children while Brown and her husband went out to celebrate their anniversary. The victim reported that she watched the children until about 10:00 p.m., and then her boyfriend Doug Wagers picked her up in his new Jeep. The victim explained that she and Wagers planned to "go four-wheeling" at a strip mine near Winfield, Tennessee, in Wagers's new Jeep. She stated that Wagers had been drinking while she was babysitting and that he had about a case of beer in the Jeep when he arrived at Brown's house. The victim testified that, before going to Winfield, the couple drove to Wagers's grandmother's house. She stated that the Defendant, who was Wagers's uncle, lived with Wagers's grandmother. She explained that the Defendant was a tattoo artist and often gave tattoos to members of Wagers's family. The victim stated that the Defendant came out of the house just as she and Wagers were about to drive away. The victim then identified the Defendant in the courtroom and explained that the Defendant had a mustache when they picked him up in the Jeep on August 16, 1999. She stated that, when the Defendant approached the Jeep, Wagers asked the Defendant to give him a tattoo, so the Defendant retrieved a bag from the house and then got inside the Jeep. The victim testified that they drove to her house, and then the Defendant gave Wagers a tattoo after the two "drank a little bit." She explained that Wagers and the Defendant drank an entire case of beer at her house. The victim stated that she did not get a tattoo or drink any beer that night.

The victim explained that, after the Defendant and Wagers finished the case of beer, all three got back into the Jeep and drove to Wagers's father's house to get more beer. She stated that they found three beers and then drove to a gas station to fill up the Jeep. The victim explained that they then drove to "the strip pits" near Winfield so they could "[g]o four-wheeling." She stated that she was in the front passenger's seat and the Defendant was in the back seat behind Wagers. The victim testified that, once they got to the strip mine, Wagers drove the Jeep around the mine. She explained

_____

[1]It is the policy of this Court to use initials of a rape victim rather than the victim's name.

that "[Wagers] . . . hadn't been through any mud holes until we got to this one and he decided he'd try to go through it. . . . [H]e dropped down in it and then we tried to get back out and couldn't." The victim testified that the Jeep got stuck in the mud hole at approximately 4:00 a.m. on August 17, 1999. She explained that:

> We tried to get it out and we couldn't, so we got out [of the Jeep] and it was late so [Wagers] didn't want to go get anybody because he said that nobody would probably help us because it being so late, that we'd just wait till in the morning and then get it out then. So then [Wagers] laid down and went to sleep after that.

The victim stated that Wagers was "[p]retty drunk" when he fell asleep at the strip mine. She testified that she thought that Wagers and the Defendant had "smoked a [marijuana] joint" that evening. The victim stated that she laid down beside Wagers and fell asleep after a few minutes. She reported that the Defendant was walking around when she and Wagers laid down.

The victim testified that a gunshot woke her up and that, when she looked to her left, she saw that the Defendant was holding a gun. She stated that she had seen the gun earlier in the evening when the Defendant placed it on the counter while he did Wagers's tattoo. The victim described the gun as an "old looking" revolver with a long barrel. She stated that, after the Defendant woke her up with the gunshot, "I didn't want him to know I was awake so I just laid back down and dozed back off." The victim stated that she awoke a second time because the Defendant was rubbing the inside of her thigh. She explained that the Defendant was located to her left and was holding the gun as he rubbed her thigh. The victim testified that "I woke up and started screaming." She explained that she attempted to wake up Wagers, but "I couldn't get nothing out of him." The victim stated that, once she started screaming, "[the Defendant] pointed the gun at [Wagers's] head and then pointed it at me." She testified that, when the Defendant pointed the gun at Wagers, he pulled the trigger, but the gun just "click[ed]" and did not fire. She stated that Wagers still did not wake up. The victim explained, "I decided that I'd walk to the nearest house because by then it was daylight, and I started walking then."

The victim testified that, as she was walking toward the house, the Defendant asked her whether she was scared, and she replied that she was scared. She stated that:

> [The Defendant] said, ["]well, I was just showing you what kind of position that you could put yourself into.["] And I told him then that I didn't think I put myself in any kind of position. And then he asked me if I'd feel better if I had that gun and I told him, ["]yeah.["] So then I had the gun in my hands, and I still kept walking until I seen that reflection off the gas tank, and I said that there must be a house there and then when I said that, then that's when he knocked me down.

The victim stated that the Defendant "tackled me like a football player," causing her to fall to her knees. She explained that she was holding the gun with both hands when she was tackled, and that the Defendant "leaned over me with both arms around me and his hands on mine." The victim stated

that she tried to point the gun at the Defendant and shoot him, but she could not pull the trigger because the Defendant blocked the trigger with his fingers.  She stated that she continued to struggle with the Defendant, and explained that "I just decided since I couldn't pull the trigger back then I'd just try to run.  And I finally got away . . . and I started running."  The victim stated that she let go of the gun and managed to get away from the Defendant, leaving the Defendant with the gun.  She testified that once she started running, "I felt my leg going out to the side and then I looked down and it was bleeding."  She explained that she had been shot in the knee, even though she did not hear any gunshots.  The victim testified that she turned around and yelled at the Defendant, "[y]ou F–ing shot me.'  And then I tried to run some more and then he tackled me again."  She stated that, after the Defendant tackled her again, he put his hand over her mouth because she was screaming.  She explained that the Defendant then "choked me and told me that he could kill me just by choking me."  The victim testified that, as the Defendant choked her, two of her necklaces were ripped off, one of which she found later when she returned to the scene.

The victim stated that the Defendant eventually stopped choking her and forced her to go up a large bank and into the woods.  She explained that as she went up the bank, her leg was bleeding badly.  The victim stated, "[w]hen we got up there, we stopped and . . . I told him that I was bleeding real bad, and he said take my tank top off and wrap it around there real tight."  She explained that she removed her tank top and tied it around her bloody knee, and then she and the Defendant continued to go into the woods.  The victim testified that, while they were stopped at the top of the bank, she lost Wagers's eye glasses when they fell out of her sports bra as she was removing her tank top.  She stated that she recovered Wagers's glasses when she returned to the top of the bank after the incident.

The victim testified that, once she and the Defendant got into the woods, "we walked a little ways, and that's when he wanted me to perform oral sex on him and I didn't want to so he put the gun against my head and then I did."  She stated that the Defendant put his penis in her mouth but that the Defendant did not get an erection, so the Defendant "decided that we would walk on back in the woods, and we did."  The victim reported that she and the Defendant stopped at a fallen log in the woods, and the Defendant "started licking my breasts . . . and he tried to have sex with me there."  She explained that the Defendant, who was carrying the gun, took her shorts and panties off while they were at the fallen log.  She stated that she was laying on her back, "and he made me stand up and lean over the log and tried it that way."  The victim testified that the Defendant was fully erect and penetrated her vagina with his penis, and that she thought that the Defendant "complet[ed] the sexual act" at that time.  She stated that, after the Defendant finished, he grabbed her shorts and panties and they continued to walk through the woods.  She stated that "I was walking with nothing but my bra and shoes on and he dropped my panties, and I think I told him that he had dropped them, but he didn't go pick them back up."  The State then introduced the victim's panties from that day into evidence, and the victim confirmed that those were the panties that the Defendant dropped in the woods.

The victim testified that, after the Defendant "dropped [her] panties," "[w]e just walked more and then again, he made me perform oral sex on him when we stopped and then that's when he put

-4-

his fingers in me . . . ." She testified that the Defendant was carrying the revolver the entire time he was assaulting her. The victim explained that she was on her back on the ground when he put his fingers inside of her vagina, and, as the Defendant inserted his fingers, he told her that "he bet I liked it like I had last night," though she did not know what he meant by that comment. She stated that, after inserting his fingers, the Defendant put the barrel of the gun inside of her vagina, which caused her pain in that area. The victim reported that, as the Defendant put the gun barrel in her vagina, he told her "[t]hat he would blow my guts out" and then pulled the trigger of the gun. She explained that the gun did not shoot, rather it just "click[ed]" when he pulled the trigger. The victim testified that "I tried to talk to him more then because I wanted to go back home. And so we got up and started walking back, or where I thought was back to the Jeep, because I really didn't know what direction to go and I just kept talking to him." She stated that the Defendant forced her to have vaginal intercourse on another occasion as they walked through the woods, though she could not remember exactly where it occurred. The victim explained that, once they arrived at the top of the bank, "[the Defendant] did make me perform oral sex again until he got an erection and we had sex again there." She stated that the Defendant forced her to have sex a total of three or four times while they walked through the woods. The victim testified that, after the last time the Defendant forced her to have sex, the Defendant stated:

> ["W]hat are we going to tell everybody? You know you're going to have to go to the hospital,["] and I said, ["]I don't know, I'll just–I'll tell them whatever you want me to, just, you know, as long as I get out of here.["] And he said, ["]why don't you just tell them that I was shooting at a snake and accidentally shot you?["] and I said, ["]okay.["]

The victim stated that, after the Defendant finished talking to her on top of the bank, they walked back to the Jeep. She explained that it was very painful to walk at that time. She reported that, when they returned to the Jeep, Wagers was asleep in the Jeep, so she got into the passenger's side of the vehicle. The victim testified that the Defendant shot his revolver into a mud hole, which woke up Wagers. She stated that Wagers then got out of the Jeep and helped her to a tree stump. She explained that Wagers told her that he was going to get somebody to help him pull the Jeep out of the mud hole, and then Wagers and the Defendant walked down the road to get help. She stated that she did not see the Defendant any more after he left with Wagers. The victim explained that she did not tell Wagers what happened at that time because she was scared. She stated that Wagers returned to the Jeep about ten minutes after he left, and then some other men came and pulled the Jeep out of the mud hole with their truck.

The victim testified that she told Wagers that she had been assaulted and raped by the Defendant as Wagers drove the Jeep out of the strip mine. She explained that "[o]n the way out that road I told [Wagers] after we had got going and he kind of got mad. And then he got mad and did a donut in the road and jumped out of the Jeep and started yelling at the woods." The victim stated that she thought that Wagers was yelling at the Defendant when he shouted at the woods. She testified that she told Wagers that she did not want to go the hospital immediately, rather she wanted to go to her mother's house or his mother's house. The victim explained that she wanted to talk to

a police officer in Tennessee, but they kept driving until they reached Pine Knot, Kentucky. She stated that she saw a police officer in Pine Knot, so she and Wagers stopped and talked to the officer about what had happened. She explained that the police officer called an ambulance, which came and took her to the Scott County Hospital. The victim stated that, at the hospital, "they did the rape kits and then they took blood in the emergency room, and then they put me in a room and set IV's up for surgery that night. And then . . . they come and got me for surgery and I had a six-hour surgery." She explained that doctors operated on the knee that had been shot by the Defendant. The State then introduced photographs of the victim taken at the hospital by Detective Robert Carson, Jr. of the Scott County Sheriff's Department. The victim explained that the photos showed that she had a busted lip, briar scratches on her arms and legs, bug bites on her back, bruises on her neck, and a gunshot wound to her knee.

The victim testified that "I had months of physical therapy. I had different braces that I had to wear, and my leg still [is not] right." She stated that she got out of the hospital on August 21, 1999, and she and Detective Carson went to the "strip pits" in Kingtown where the rapes and assault occurred. The victim stated that she showed Detective Carson where the Defendant raped and assaulted her near the strip mine. She stated that she has problems walking up and down stairs due to her knee and that her knee was numb.

On cross-examination, the victim acknowledged that she gave earlier statements that were inconsistent with her testimony at trial. She admitted that she stated to Detective Don Laxton of the Scott County Sheriff's Department that, when she and the Defendant were walking to a nearby house, she started running and then the Defendant shot her. The victim also admitted that, in the earlier statement, she stated that the Defendant dragged her into the woods rather than walking into the woods with her. The victim explained that, after giving the earlier statements, she and Detective Carson sat down later in the evening on August 17, 1999, and "iron[ed] everything out" regarding the sequence of events that day. She stated that she did not give the proper sequence of events in the earlier statements because she was rushed and "it was fast, I was not right. I was shot, I was in the hospital, I had been there for three hours, . . . [with] no medical attention at all." The victim also stated that she gave a statement to Dr. Katherine Martin that differed from her testimony at trial.

The Defendant then introduced a video tape, which Detective Carson made in the presence of the victim on August 21, 1999, at the strip mine near Winfield, and played it for the jury. The victim identified members of her family who accompanied her to the strip mine on the video tape. The victim denied that Wagers caught her "in a situation" with the Defendant and then shot her in the leg.

Dr. Katherine Martin, a physician at Scott County Hospital who practiced primarily obstetrics, gynecology and family practice, testified that she performed the rape kit on the victim on August 17, 1999, in the emergency room of the hospital. The parties stipulated that Dr. Martin was an expert in the field of medicine. Dr. Martin testified that she asked the victim a series of questions regarding her rapes and assault. She stated that the victim told her that the rapes occurred between 7:00 a.m. and 10:00 a.m. on August 17, 1999. Dr. Martin reported that she started the rape kit at

12:20 p.m. that same day. She explained:

> In [the victim's] case, there was successful penetration of the vaginal vault times two. She did not think there was any ejaculation at that time. The anus was not penetrated. The mouth was penetrated times [two,] as well as having oral genital contact between her performing it on . . . the male, as well as him performing it on her. Okay. There was also use of insert of foreign objects which is asked on here. . . . In her case, there was use of insert of foreign objects. . . .
>
> . . . .
>
> It asks you if there was coercion, which was force, and her answer in that is yes, with a gun as well as fists, verbal threats, and the quote that I have written here is telling that he would kill me if I was not quiet or did not do what he told me.
>
> Then it asks you to rate what her emotional status is at that time. . . . And she appeared frightened and was crying upon arrival but was in general able to voice what had gone on with her.
>
> Then you need to describe whether she has had torn clothes, scratches, those kind of things. And it goes into that, where [the victim] had torn clothes with multiple scratches on her arms and her neck and her body, as well as the gunshot wound to her right leg.

Dr. Martin testified that the victim did not have any underwear on at the time she performed the rape kit. She stated that she collected all the clothing the victim was wearing, including her shirt and shorts, and placed the items in plastic bags as evidence. Dr. Martin testified that, once she did the rape kit and collected the clothes, she gave the evidence and rape kit evaluation to Detective Carson. Dr. Martin explained that she performed an oral swab of the victim, swabs of her breasts, belly and external genital area, and a swab of the vaginal area. She stated that she also did a pubic hair sampling of the victim and that the hospital drew two tubes of blood from the victim. Dr. Martin testified that she tested the victim for drugs, did cultures for sexually transmitted diseases such as gonorrhea and syphilis, and did blood tests for HIV and syphilis. The State then introduced the rape kit and the blood sample into evidence.

On cross-examination, Dr. Martin testified that the victim did not want Wagers to visit her in the intensive care unit following the surgery on her knee because "[t]here was some concern that she might get upset with him there . . . ." She testified that, generally, the hospital only allows family members into the intensive care unit. Dr. Martin stated that, when the victim first gave statements about the rapes, she may not have given a full account of what happened. The doctor explained that:

> [W]ithin that first 24 to 48 hours after an event like this, you may only get part of the story that comes out. It may be that there can be memory losses where they won't

actually remember part of the event . . . they'll say ["]I don't know how I got to here.["] And literally they can't remember that time. And maybe later on it will . . . come back to them.

Dr. Martin explained that victims of rape often suffer from post-traumatic stress syndrome which affects how they answer questions following an attack. She stated that, in her experience, victims who alleged that their attackers inserted foreign objects into their private areas showed "visible trauma" in those areas, "but it doesn't necessarily mean that there would always be visible trauma." Dr. Martin further explained that, in her experience, forcible rape does not always result in abrasions, marks or other physical trauma. The doctor stated that, considering the victim's account of the rape in this case, she would not expect there to be any kind physical trauma. Dr. Martin testified that, based upon her visual exam of the victim, she could not find physical evidence of rapes or forcible sex, "but that's not always a discernable thing." She stated that, at the time of the exam, the victim "was normal for a female."

On re-direct examination, Dr. Martin testified that it was possible for a woman to be raped without causing trauma to the vaginal area. The doctor explained that evidence of trauma would depend upon factors such as the duration and force of sexual intercourse and the size of the attacker's penis. Dr. Martin testified that, based upon her examination of the victim, she did not doubt that the victim was raped, even though she did not find any physical evidence of trauma.

Dr. William Hardy, an orthopedic surgeon, testified that he examined the victim's knee on August 17, 1999, at Scott County Hospital. The parties stipulated that Dr. Hardy was an expert in orthopedic surgery. Dr. Hardy testified that the bullet "entered her knee just to the inside . . . of the kneecap . . . above the knee joint and then went down through the joint, entered the tibia or tibia plateau . . . through the bone, fracturing a large piece of bone off and then going on through down into the calf muscle." He stated that he performed surgery on the victim's knee, which involved four different procedures. The doctor explained that the injury to her knee was a permanent injury, and that the victim had to go through extensive physical therapy to recuperate. He stated that, as the victim gets older, she will have "some problems with that knee as far as earlier arthritis."

On cross-examination, Dr. Hardy testified that the bullet entered the knee at a medium trajectory, possibly at a forty-five degree angle. He stated that, based upon the patient's history, her injury would have been made worse by the victim's running after being shot. The doctor explained that he could not tell whether the victim was shot from a distance of two inches, six inches or a foot. Dr. Hardy testified that the victim's knee had to be bent when she was shot to sustain the injury she received. He stated that it was possible for a person to be shot and then not immediately notice it until moments later, due to the person being excited or scared.

Detective Robert Carson, Jr., of the Scott County Sheriff's Department testified that he specialized in investigating violent crimes against women, child sex abuse and child physical abuse. Detective Carson stated that he investigated the rape of the victim on August 17, 1999. He stated that he received the rape kit, including the victim's clothes from that day, from Dr. Martin and took

the items to the Tennessee Bureau of Investigation ("TBI") lab in Knoxville. Detective Carson testified that, on the day the victim was raped, she did not appear to be taking any drugs or alcohol. He explained that, on August 18, 1999, he sat down with the victim and interviewed her for approximately three hours in the intensive care unit at Scott County Hospital. Detective Carson testified that the victim had been interviewed briefly on the previous day, but that interview took place in the emergency room of the hospital, which was busy and full of people. He explained that the emergency room "was not the place where you'd do a real interview, you know, and get down to the details." He stated that, on the day the victim was raped, the victim "was gonna probably go into surgery, and she just wasn't in a mental state really to do much of an interview."

Detective Carson testified that, after the victim got out of the hospital, he asked her to accompany him to the strip mine near Winfield to show him where the rape occurred. He stated that, to his knowledge, none of the victim's family members planted any evidence at the crime scene. Detective Carson testified that he obtained an arrest warrant for the Defendant before he completed his investigation because "I had decided that there was . . . probable cause there to believe he'd committed the crimes. . . ." He explained that the Defendant was arrested in Kentucky and brought back to Tennessee. The detective stated that the Defendant agreed to submit to an HIV test, which is required for anyone arrested for rape in Tennessee, and a DNA[2] comparison test. He explained that the Defendant signed agreements for both blood tests and that he sent the blood sample for the DNA comparison test with the rape kit to the TBI lab in Knoxville.

Detective Carson testified that the victim's panties were found by the victim's step-brother, David Lee King, in the woods near the strip mine a few days after the victim was attacked. The detective stated that the victim's step-brother called him, and then the detective took a picture of the panties at the scene and put them into an evidence bag. He explained that the victim's necklace and Wagers's glasses were found in plain view at the crime scene. On cross-examination, Detective Carson testified that, based upon the victim's statement and her gunshot wound, he had probable cause to get an arrest warrant for the Defendant. He stated that the victim's earlier statement to another detective in the emergency room "had a lot of stuff in it that was out of sequence. It's been my experience that people that are upset, a lot of times, they just start blurting things out and they don't necessarily get them, you know, in the right sequence." Detective Carson testified that the victim described her missing panties when he interviewed her and that the panties found at the crime scene matched her description. He stated that he never found a gun during the course of his investigation. The detective explained that two detectives and Wagers looked for the gun around the strip mine, but they could not find it. Detective Carson testified that he believed that the Defendant disposed of the gun after the incident, so he did not expect to find a gun near the crime scene.

King testified that he and several other members of the victim's family went to the "strip pits" near Winfield on August 21, 1999, the day the victim left the hospital. King stated that he did not see his father, Herbie King, plant any evidence that day at the crime scene. He explained that

_____

[2]Deoxyribonucleic acid.

he found a pair of panties "laying in the bushes and stuff" and then called Detective Carson. King stated that he found the panties in the woods about one hundred and twenty-five yards from the edge of the "strip pits." He denied planting the panties. On cross-examination, King testified that he gave a statement to Detective Carson regarding the incident. He denied telling the detective that he thought Wagers was involved in what happened to the victim and that Wagers set up the victim by purposefully driving into the mud hole.

Dave Ferguson of the TBI lab in Knoxville testified that he worked in the Serology Unit in the TBI lab. He explained that serology "deals with the determination of bodily fluids that are present on a piece of evidence." Ferguson stated that the most common body fluids the TBI lab looked at were semen, saliva and blood. The parties stipulated that Ferguson was an expert in the field of forensic serology. Ferguson testified that the TBI lab received the victim's rape kit on August 19, 1999, and the Defendant's blood samples on September 1, 1999. Ferguson stated that he found semen stains on the victim's shorts, which tested positive for semen and sperm. He explained that the victim's vaginal swab also tested positive for semen and sperm. However, Ferguson testified that the victim's oral swabs tested negative for semen and sperm. He stated that the victim's blood sample tested negative for drugs or alcohol. Ferguson explained that the Nashville TBI lab did a DNA comparison between the Defendant's blood and the semen that was found on the shorts and in the vaginal swab.

Raymond Depriest testified that he worked for the TBI DNA Unit in Nashville for almost eleven years and was considered an expert in DNA analysis and profiling at trial. Depriest testified that he received blood samples from the victim and the Defendant, the vaginal swabs of the victim and a small cutting of the victim's jean shorts. He stated that he analyzed the DNA of the victim and the Defendant and then compared that with the semen that he found on the swabs and the cutting of the pants. Depriest explained, "Upon analyzing the vaginal swab and looking at the female fraction, I found the DNA profile to match [the victim]. And upon looking at the male fraction from the vaginal swab, I found that to match [the Defendant]." He stated that, statistically, the probability that the sample taken from the vaginal swab was from someone other than the Defendant was "greater than one in six billion." He stated that, after comparing the semen stain with the blood samples from the victim and the Defendant, the results were identical to the comparison done with the vaginal swabs. He stated that the Defendant's DNA matched the DNA found on the victim's shorts to the same degree of certainty as the vaginal swab comparison–greater than one in six billion.

The Defendant then called Douglas Wagers, the victim's boyfriend at the time of the incident, who testified that he married the victim in June of 2000. Wagers testified that he did not remember what happened at the "strip pits" on August 17, 1999, because "I was drunk, passed out down there." Wagers stated that he met the Defendant on the evening of August 16, 1999, at his grandmother's house because "I figured I'd be nice and stop in and see what [the Defendant] and my [grandmother] was doing." He testified that he did not remember telling Detective Don Laxton of the Scott County Sheriff's Department that he met the Defendant in Revelo, Kentucky, as the Defendant was walking beside the road. Wagers stated that, after he and the victim picked up the Defendant, "we got some beer and we went to my house and he put a tat[t]oo on my back."

Wagers testified that he started drinking at around noon on August 16, 1999, and, by the time he met the Defendant, he had drunk almost a case of beer. Wagers also stated that he took a Valium and smoked marijuana that evening. He reported that, earlier in the day, he purchased two new Jeeps from a man in Kentucky, and he and the victim had planned to take one of the Jeeps to the "strip pits" to try it out. Wagers admitted that he should not have been driving in his drunken condition that night. He stated that the victim was not drinking that night because "she don't drink." Wagers explained that he did not remember driving to the "strip pits" and that "I don't even remember doing half the things that they said I d[id]." He stated that he did not remember driving into the mud hole, but he remembered trying to get the Jeep out of the hole. He reported that they got stuck in the mud hole between 2:30 a.m. and 3:30 a.m. on August 17, 1999. Wagers testified that he, the Defendant and the victim attempted to get the Jeep out of the mud hole, but he finally gave up. He stated that he thought about going for help, "but I thought who's going to walk up to somebody out in the middle of nowher[e] and beat on their door at 3:30, 4:00 o'clock in the morning[?]" Wagers testified that he decided to wait because "[t]hat was the only thing to do." He reported that he told the victim and the Defendant that they would wait until daylight and then he would go and get help. Wagers stated that he then laid down on the ground and passed out. He explained that he "was out cold" and that he did not remember the victim screaming and shaking him to wake him up. He reported that "I woke up at daylight with a gunshot that [the Defendant] shot right beside my head into the water . . . and he was standing over me smiling." Wagers testified that, after waking up, he noticed the victim sitting on a tree stump holding her leg, and he thought that she had fallen and hurt her leg. He stated that the victim "had tears and stuff in her eyes, but she told me nothing was wrong." Wagers explained that he asked the victim what was wrong and "[s]he didn't say anything at all. She just looked at me." He stated that, at that time, he did not suspect that the Defendant had done anything to the victim.

Wagers stated that he was concerned for the victim, so he and the Defendant started walking on the road toward some houses to get some help. He explained:

> Me and [the Defendant] started walking out the road, up to a few houses and was going to get somebody to come back and try to pull us out of this mud hole, and I asked him about the gun. I told him the way he looks, walking out with a gun there, we're not going to get nobody to come back in the pits and pull us out. He was supposed to have just laid the gun down in the woods, and that was the last I seen of him. I never seen him again until now.

Wagers stated that the Defendant walked toward the woods with his gun and then disappeared. He explained that he continued down the road to find someone with a four-wheel drive truck, and, once he found someone, they drove back to the "strip pits" and pulled the Jeep out of the mud hole. Wagers testified that, as he and the victim were driving out of the "strip pits," the victim finally told him what had happened and what the Defendant had done. He explained that "[s]he told me [the Defendant] had raped her, shot and raped her." Wagers stated that, once the victim told him what happened, "I kind of went crazy there at the beginning and then took her on out of Kingtown and took her to the first cop I saw." He stated that he could not remember telling Detective Laxton that

he saw the Defendant on the road that morning and attempted to run him over, but he explained, "I sure wish I would have. I would have run over him." Wagers denied fighting with the Defendant that day and denied touching the gun or throwing the gun toward a pond.

On cross-examination, Wagers testified that the Defendant was his uncle and that, before this incident took place, he often "hung around" with the Defendant at his grandmother's house. He stated that the victim did not want to associate with the Defendant and did not want Wagers to pick him up on August 16, 1999. Wagers also testified that the victim did not want to go "four-wheeling" at 1:00 a.m., but he talked her into it. He stated that the Defendant's gun was a "western style" .22-caliber revolver with a long barrel and that the gun actually belonged to his grandmother. Wagers stated that, once he passed out, he did not hear anything that happened at the "strip pits" until the Defendant shot the gun near his head when it was daylight. He explained that he understood why the victim did not tell him that the Defendant had raped and shot her while the Defendant was standing near her with a gun. Wagers explained that he was ashamed of his stupidity that put the victim in that position with the Defendant, and he told Detective Laxton the story about fighting with the Defendant because he was ashamed. He admitted that, if he had not driven the victim and the Defendant to the "strip pits," the victim would not have been attacked. Wagers testified that the victim's family blamed him for what happened after the attack, and he understood why they blamed him.

L.B. Crabtree testified that he was working on a house near the "strip pits" when a "small boy," Wagers, approached him before noon on August 17, 1999, and asked him to help pull a Jeep out of a mud hole. Crabtree stated that "[Wagers] said he was stuck and that his wife had messed her knee up and wanted us to pull them out." He explained that he told Wagers to ask some other men down the street for a chain and then he could help pull the Jeep out. Crabtree stated that, when he saw Wagers drive by in a truck toward the "strip pits," he got into his truck and followed them. He explained that he helped pull the Jeep out and noticed the victim sitting on a big rock with a towel or something around her knee. Crabtree stated that he did not see the Defendant when he went to help Wagers. Gary Clark testified that he also helped Wagers get his Jeep out of the mud hole and noticed that the victim "seemed to be sad."

Detective Don Laxton of the Scott County Sheriff's Department testified that he did a preliminary investigation of the shooting and rape of the victim, which included going to the "strip pits" to search for evidence and taking statements from Wagers and the victim. Detective Laxton stated that Wagers read the statement he gave at Scott County Hospital on August 17, 1999, and did not have any problems with it at the time. Detective Laxton stated that he, three other officers from the sheriff's department and Wagers went to the "strip pits" to "see if we could locate the location where everything took place and see if we could find a gun." He testified that they searched around the "strip pits," particularly around the pond, because Wagers told them that the Defendant had thrown the gun in that area. He explained that they never found the gun or any other evidence at that time. On cross-examination, Detective Laxton stated that he took the victim's statement at the emergency room before the surgery on her knee and that the interview only lasted about ten to fifteen minutes. He explained that he wanted a brief statement "to give me something to go by." Detective

Laxton testified that it was common practice for a law enforcement officer to get a brief initial statement from the victim and then follow-up with a more detailed statement later in the investigation. He stated that Wagers later recanted his earlier statement that he fought with the Defendant after he found out that the victim was raped. Finally, Detective Carson testified that the victim's step-brother, David King, told him that he thought that Wagers may have "set up" the victim by purposefully getting stuck in the mud hole.

## II. Analysis

On appeal, the Defendant contends the following: (1) the trial court erred in permitting the jury to take the "bill of particulars" into the jury room during deliberations; (2) the Defendant's convictions for aggravated rape by digital penetration and aggravated rape by oral sex violate the principles of double jeopardy and duplicity of offenses; (3) the trial court erred in failing to dismiss or merge the especially aggravated kidnapping conviction into one of the aggravated rape convictions; (4) the trial court erred in refusing to permit the jury to review a copy of the statement that the victim gave to a police officer; (5) the trial court erred in failing to instruct on the lesser-included offense of false imprisonment; (6) insufficient evidence exists to support the convictions; and (7) the trial court erred in sentencing the Defendant to an effective sixty-year sentence.

### A. Bill of Particulars

The Defendant contends that the trial court erred in permitting the jury to take the enlarged copy of the bill of particulars into the jury room during deliberations. The bill of particulars filed by the State stated as follows:

> The State of Tennessee hereby responds to the defendant's motion for a Bill of Particulars as follows:
>
> All of the offenses occurred on or about 17 August, 1999 at abandoned strip pits off Kingtown Road near the town of Winfield in Scott County, Tennessee. The acts of the defendant which constitut[e] the offense alleged in each count of the indictment are more particularly described and differentiated below.
>
> 1.   Especially Aggravated Kidnapping. The defendant confined [the victim] by physical force and by threatening and shooting her with a gun thereby causing serious bodily injury.
> 2.   Aggravated Sexual Battery. The defendant rubbed the upper inside thigh of [the victim] while in possession of a gun.
> 3.   Aggravated Rape. The defendant put a gun to [the vicim's] head and forced her to perform oral sex on him on the first occasion.
> 4.   Aggravated Rape. The defendant, while in possession of a gun, forced [the

-13-

victim] to stand up and lean over a log while he sexually penetrated her vagina with his penis.

5.  <u>Aggravated Rape</u>.  The defendant, while in possession of a gun, placed his fingers inside [the victim's] vagina.

6.  <u>Aggravated Rape</u>.  The defendant placed the gun barrel inside [the victim's] vagina.

7.  <u>Aggravated Rape</u>.  The defendant, while in possession of a gun, forced [the victim] to perform oral sex on him on a second occasion.

8.  <u>Aggravated Rape</u>.  The defendant, while in possession of a gun, sexually penetrated [the victim's] vagina with his penis.

9.  <u>Aggravated Rape</u>.  The defendant, while in possession of a gun, forced [the victim] to perform oral sex on him on a third occasion.

10. <u>Aggravated Rape</u>.  The defendant, while in possession of a gun, inserted his penis in [the victim's] vagina while she was lying on her back.

11. <u>Attempted Second Degree Murder</u>.  The defendant, after placing his gun barrel into [the victim's] vagina, pulled the trigger.

12. <u>Aggravated Assault</u>.  The defendant shot [the victim] with a gun in or near the knee causing serious bodily injury.

. . . .

We note that the enlarged version of the bill of particulars was not included in the record on appeal; however, both the State and the Defendant acknowledge that the enlarged version was identical to the bill of particulars filed by the State on June 13, 2000, except that the enlarged version stated "specifics of charge" and then included the twelve counts as quoted above.

The record shows that, initially, the State requested that either the bill of particulars or the enlarged version of the same be sent to the jury room for the jury to use during deliberations. The State noted to the trial court that the jury looked at the enlarged version of the bill of particulars throughout the entire trial and explained that "we talked about it in opening and in closing . . . so it's nothing new that they've seen, it just lets them have a–kind of a scorecard . . . so there can be unanimity on which count it is they are talking about he did the particular things." At that time, the Defendant objected to either the bill of particulars or the enlarged version of the document being submitted to the jury along with the rest of the exhibits. The trial court denied the State's request to send the bill of particulars to the jury at the beginning of deliberations. After deliberating for a short time, the jury requested that the trial court send the enlarged version of the bill of particulars to the jury room. The trial court held the following proceedings regarding the jury's request:

[THE COURT]: All right. Let me deal with this first. We were on record a minute ago discussing–General Galloway requested the bill of particulars be sent back as part of their Exhibits. Now, the defense objected and then we considered the possibility of sending back a chart that was shown only to demonstrate, it was not entered as an exhibit, and it was essentially demonstrative of the charges that [the Defendant] was facing and a brief summary that speaks for itself as to each charge.

-14-

[MR. GALLOWAY]: Your Honor, I think what this appropriately is, and because we filed this bill of particulars before trial and then amended before trial, it's sort of like a pre-trial election as to . . . the specific facts of each count. And perhaps to make it clearer in the future, what we ought to do is file something separate at some point saying–which I've done in other cases where we didn't file a bill of particulars–that this is what we elect the facts are for this case, and that's what–really, because we've done all this ahead of time, much more so than they do in other places that we're getting all these problems in Court in cases. We've all done this ahead of time, it's already there. What this really is, is our election as to what the facts are as to each count and that, we think, is appropriate.

[THE COURT]: I understand what you're saying, and I know you have done it particularly, General, in other counties–that you essentially file the chart as an exhibit. They have just made it into the record as an exhibit and they've taken it back and then–

[MR. GALLOWAY]: Perhaps we have–I think in some we have and some we haven't. But usually always if we have it and they don't take it back there, they ask for it.

[THE COURT]: Right. It is very helpful, and the defense objected not only to the bill of particulars being presented, but also the chart, and what I said was I'm not going to send it back, but I'm going to wait and see what they're going to do. Now, since they've asked for it, I'm going to do it. But I thought it would be very–it could be very prejudicial to either side if the Court, on his own, sent it back there. So since they're asking for it, I'm going to give it to them. Do you-all understand? And, of course, [the Defendant's] objection is noted.

In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). In making these decisions, the trial court must consider "the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial." State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial judge arbitrarily exercised his discretion. State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993)). The election requirement "safeguards the defendant's state constitutional right to a unanimous jury

-15-

verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citing Brown, 992 S.W.2d at 391); see Kendrick, 38 S.W.3d at 568. The Tennessee Supreme Court explained that "'[a] defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence.'" Kendrick, 38 S.W.3d at 568 (quoting Shelton, 851 S.W.2d at 137). Moreover, the election requirement serves other interests as well: "it enables a defendant to prepare for a specific charge; it protects a defendant against double jeopardy; it enables the trial court to review the weight of the evidence in its capacity as thirteenth juror; and it enables the appellate court to review the legal sufficiency of the evidence." Id. Failure of the State to elect offenses when the proof requires an election is plain error. See Walton, 958 S.W.2d at 727.

Applying the law to the facts of this case, we conclude that the trial court did not abuse its discretion by sending the enlarged version of the bill of particulars to the jury for deliberations. The State was required to elect the facts upon which it was relying to establish the charged offenses because the indictment charged the Defendant with twelve separate offenses against the victim. The State satisfied the election requirement by filing the bill of particulars in response to the Defendant's motion. The State then used the enlarged bill of particulars as a demonstrative chart during its opening statement and closing argument. Because the indictment did not set forth the particular facts the State was relying upon for each charge, the bill of particulars was essential in this case because it ensured that the jurors deliberated and rendered a verdict based on the same evidence for each charge. In submitting the bill of particulars to the jury by allowing the enlarged chart version of the bill of particulars into the jury room during deliberations, the trial court ensured that the Defendant's state constitutional right to a unanimous jury verdict was protected. Without the aid of the enlarged version of the bill of particulars, the jury may have rendered a "patchwork verdict" based on different offenses in evidence. Indeed, the submission of the enlarged version of the bill of particulars was arguably beneficial to the Defendant because the jury acquitted the Defendant of three of the eight counts of aggravated rape in the indictment: count five, which alleged that the Defendant placed his fingers in the victim's vagina; count nine, which alleged that the Defendant forced the victim to perform oral sex on him on a third occasion; and count ten, which alleged that the Defendant penetrated the victim's vagina with his penis "while she was lying on her back." Furthermore, the Defendant did not object to the enlarged version of the bill of particulars being used in the State's opening statement and closing argument. The jury was familiar with this chart and obviously used it as a "roadmap" in making its decisions to convict the Defendant of some of the counts in the indictment and acquit him of other counts. Even though the enlarged version of the bill of particulars was not admitted into evidence as an exhibit, we conclude that the trial court did not abuse its discretion by allowing the jury to use the chart during deliberations because it served to protect the Defendant's state constitutional right to a unanimous verdict on each charge of the indictment.

## B. Double Jeopardy

The Defendant contends that, because the actions supporting the aggravated rape by digital

penetration conviction and the actions supporting the aggravated rape by oral sex conviction occurred at approximately the same time and involved a continuous course of conduct, he can only be convicted of one count of aggravated rape based upon this conduct. However, the verdict forms indicate that the jury acquitted the Defendant of count five of the indictment, which, according to the bill of particulars, charged the Defendant with aggravated rape by digital penetration. Therefore, we conclude that this issue is without merit.

## C. **State v. Anthony Violation**

The Defendant contends that the trial court erred in failing to dismiss or merge the especially aggravated kidnapping conviction into one of the aggravated rape convictions because the removal of the victim from the area of the Jeep was merely incidental to the rapes. In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), the Tennessee Supreme Court held that a separate kidnapping conviction may violate due process when "the confinement, movement, or detention is essentially incidental to the accompanying felony" and not "significant enough, in and of itself, to warrant independent prosecution . . . ." Anthony, 817 S.W.2d at 306; see State v. Cozart, 54 S.W.3d 242, 244-45 (Tenn. 2001). The Tennessee Supreme Court explained:

> The first question is whether the movement or confinement used was beyond that necessary to commit the accompanying felony. State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997) (citing Anthony, 817 S.W.2d at 306). 'If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id.

Cozart, 54 S.W.3d at 245. In Anthony, the Tennessee Supreme Court heard consolidated appeals and set forth the standard for determining whether kidnapping was "essentially incidental" to an underlying offense. Anthony, 817 S.W.2d at 300. The defendants were convicted of armed robbery, armed burglary and aggravated kidnappings for their actions in robbing a Shoney's Restaurant. Id. at 301. The restaurant had just closed, and three employees were emptying garbage into a dumpster when the defendants approached the employees and forced them at gunpoint to lie on the ground. Id. While one defendant remained with the three outside employees, the other defendant entered the restaurant through the back door. Id. The defendant who entered the restaurant ordered, at gunpoint, two employees to go into an office in the back. Id. When the two employees arrived at the office, the defendant demanded that the safe be opened, but one of the employees informed him that the safe was in the front of the restaurant by the cash register. Id. The defendant then instructed one of the employees to lie on the floor of the office as he and another employee went to the front of the restaurant toward the safe. Id. After the defendant took the money from the safe, he pointed his gun at another employee exiting the restroom and ordered him to "get back in the men's room and stay there." Id. The defendants then fled the scene. Id. The entire episode took slightly more than five minutes. Id.

In Anthony, the Tennessee Supreme Court reversed the kidnapping convictions, holding that

the kidnappings were essentially incidental to the robberies based on the following findings: (1) the removal or confinement did not subject the victims "to any substantially increased risk of harm over and above that necessarily present in the crime of robbery itself;" (2) the victims' movement was slight; (3) the victims' confinement was brief; and (4) the victims "were not harmed in any way." Id. at 307.

In State v. Coleman, 865 S.W.2d 455 (Tenn. 1993), the jury convicted the defendant of armed robbery, aggravated rape, and aggravated kidnapping for crimes committed against the victim at Vincent's Shoe Store. The defendant pointed a gun at the victim and demanded all the money in the register. Coleman, 865 S.W.2d at 456. The defendant then ordered the victim at gunpoint to the back of the store and forced her to enter a side room, where he ordered her to undress and then raped her. Id. at 457. After committing the rape, the defendant forced the victim to lie face down on the floor for several minutes and told her not to get up. Id. Shortly thereafter, the defendant fled the scene and the victim ran for help to a shop next door. Id. Applying the test enunciated in Anthony, the Tennessee Supreme Court reversed the kidnapping conviction, holding that the abduction was essentially incidental to the robbery. Id. The Court found that the facts only supported convictions for aggravated robbery and aggravated rape. Id.

In Dixon, the Tennessee Supreme Court applied Anthony to a case in which the defendant grabbed the victim from behind, dragged her approximately thirty to forty feet from the illuminated sidewalk to an unlit, vacant lot concealed from the road by foliage, beat and forcefully undressed her, and then sexually assaulted her. Dixon, 957 S.W.2d at 533. After forcefully undressing her and beating her, the defendant then forced the victim to perform oral sex on him and digitally penetrated the victim's vagina. Id. The victim then fled to a nearby house for help. Id. The defendant was convicted of aggravated kidnapping, aggravated assault, and attempted sexual battery. Id. In Dixon, the Tennessee Supreme Court explained that:

> The Anthony decision should only prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery. Accordingly, any restraint in addition to that which is necessary to consummate rape or robbery may support a separate conviction for kidnapping.

Id. at 534-35. The Dixon court held that the kidnapping was not incidental to the aggravate assault because "[t]he brutal beatings were not necessary for the commission of either the kidnapping or the attempted sexual battery. Likewise, the movement to the back of the vacant lot was not necessary for commission of the aggravated assault." Id. at 535. Furthermore, the Court found that:

> [T]he defendant's act of dragging the victim approximately thirty to forty feet after the initial assault was beyond that necessary to complete the attempted sexual battery. Had [the defendant] confined and attempted to sexually penetrate the victim where he initially physically assaulted her, the confinement would have been merely incidental to the attempted sexual battery.

-18-

Id. As to the second inquiry, the Court found that the defendant dragged the victim to the secluded location to avoid detection. Id. The Court also found that the defendant's movement of the victim "substantially increased the risk of harm to the victim." Id. The Dixon court explained that "[t]he lessened risk of detection increased the risk of harm to the victim. Moreover, the victim sustained serious bodily injuries." Id.

In this case, as the victim was walking toward a nearby house to get help, the Defendant tackled her from behind and wrestled the gun away from her and, after she ran from him, he shot her in the knee. The victim stated that, after she ran from the Defendant, he tackled her again and put his hand over her mouth because she was screaming. She explained that the Defendant then "choked me and told me that he could kill me just by choking me." The victim further stated that the Defendant, who was still in possession of the gun, then forced her to go up a steep bank and into the woods. The victim testified that the Defendant then forced her to walk deeper into the woods and subsequently raped her multiple times. The evidence indicated that the victim was not free to leave until the Defendant led her back to the Jeep at the "strip pits." We conclude that this case is factually similar to Dixon. As the Dixon court concluded, the Defendant's act of forcing the victim up a steep bank and into the woods was beyond that necessary to complete the series of aggravated rapes. Had the Defendant confined and raped the victim where he initially tackled her, the confinement would have been merely incidental to the aggravated rapes. The Defendant's movement of the victim up a steep bank and into the woods, however, exceeded that restraint necessary to consummate the acts of aggravated rape.

We now focus on the second inquiry, which is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. The evidence indicates that the Defendant forced the victim to go up the steep bank and into the woods in order to avoid detection. At the time the Defendant tackled the victim, they were still close to Wagers and the Jeep, and they were out in the open in the "strip pits," so they could possibly be detected. By taking the victim deep into the woods, the Defendant wanted to avoid alerting Wagers or anyone else who was close by. As the Dixon court found, we hold that the Defendant's movement of the victim lessened the risk of detection and substantially increased the risk of harm to the victim. Moreover, the Defendant's movement of the victim into the woods prevented the victim from summoning help, which in turn increased her risk of harm. Therefore, based upon the foregoing, we conclude that the Defendant's especially aggravated kidnapping conviction did not violate Anthony, and the Defendant's convictions for especially aggravated kidnapping, aggravated rape, aggravated sexual battery and aggravated assault may stand.

### D. Victim's Statement

The Defendant contends that the trial court erred in refusing to permit the jury to review the testimony of Detective Carson, including the victim's written statement to the detective. During deliberations, the jury sent the following question to the trial court: "We, the jury, request a copy of Robby Carson's interview with [the victim]." The trial court responded as follows: "The evidence

in this case is complete, and the trial cannot be reopened for the introduction of new evidence not previously admitted. You must render your verdicts, basing them only on the evidence offered and admitted during the trial. Do you understand what I'm answering?" The jurors answered affirmatively. According to the question submitted to the trial court, the jury wanted to review Detective Carson's interview with the victim, which Detective Carson wrote the day after the victim was attacked. Neither the State nor the Defendant entered the statement into evidence. The jury did not request "to review the testimony of Detective Carson," as the Defendant contends in his appellate brief.

Tennessee Rule of Criminal Procedure 30.1 states that "[u]pon retiring to consider its verdict the jury shall take to the jury room all exhibits and writings *which have been received in evidence*, except depositions, for their examination during deliberations, unless the court, for good cause, determines that an exhibit should not be taken to the jury room." See also State v. Long, 45 S.W.3d 611, 625 (Tenn. Crim. App. 2000) (emphasis added). Jurors must render their verdict based on evidence presented and properly admitted at trial. Caldararo by Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990) (citing Citizens' St. R. Co. v. Burke, 98 Tenn. 650, 653, 40 S.W. 1085, 1085 (1897)); see State v. Dunlap, No. W1999-00027-CCA-R3-CD, 2000 WL 135754, at *2 (Tenn. Crim. App., at Jackson, Feb. 2, 2000) (no Tenn. R. App. P. 11 application filed). We note that, unlike the bill of particulars discussed earlier, the victim's statement to Detective Carson was substantive evidence that both sides decided not to introduce into evidence at trial. Detective Carson testified about his interview with the victim, though he did not go into great detail about the statement. The bill of particulars, on the other hand, was not substantive evidence and was displayed by the State throughout its opening statement and closing argument as a demonstrative aid to show the jury what facts the State was relying upon for each count in the indictment. The trial court allowed the jury to use the enlarged chart of the bill of particulars during its deliberations to ensure that the jury reached unanimous verdicts on each count in the indictment. We conclude that the trial court did not abuse its discretion in denying the jury's request to review "a copy of Robby Carson's interview with [the victim]" because neither side entered the statement into evidence.

### E. Lesser-Included Offense Instructions

### 1. False Imprisonment

Next, the Defendant contends that the trial court erred in failing to instruct on the lesser-included offense of false imprisonment. We conclude that the trial court's error in failing to instruct on false imprisonment was harmless beyond a reasonable doubt.

The trial court has a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction is supported by the evidence, regardless of whether the Defendant has requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser-included offenses is de novo with no presumption of correctness. State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002).

If an offense is found to be a lesser-included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser-included offense. Bowles, 52 S.W.3d at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. The court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469.

The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." Id. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

In this case, trial court charged the jury on especially aggravated kidnapping and the lesser-included offenses of aggravated kidnapping and kidnapping, but the trial court failed to charge the jury on false imprisonment. We conclude that the trial court erred by failing to instruct the jury on false imprisonment, because false imprisonment is a lesser-included offense of especially aggravated kidnapping. State v. Combs, Nos. E2000-02801-CCA-R3-CD, E2000-02800-CCA-R3-CD, 2002 WL 31118329, at *60 (Tenn. Crim. App., at Knoxville, Sept. 25, 2002), *perm. app. denied* (Tenn. Jan. 27, 2003). In Combs, this Court noted that false imprisonment, defined in Tennessee Code Annotated section 39-13-302(a) (1997), is incorporated by reference into the statutory definition of especially aggravated kidnapping found in Tennessee Code Annotated section 39-13-305(a). Combs, 2002 WL 31118329, at *60. Therefore, this Court found that false imprisonment was clearly a lesser-included offense under part (a) of the Burns test. Id.

Regardless, we conclude that the trial court's error in failing to instruct the jury on false imprisonment was harmless beyond a reasonable doubt. Harmless error relating to the failure to charge lesser-included offenses must be shown "beyond a reasonable doubt." Ely, 48 S.W.3d at 727. The proper inquiry is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191. In making the harmless error determination, this court should "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id. In State v. Williams, 977 S.W.2d 101 (Tenn. 1998), the defendant was convicted of first degree premeditated murder. The trial court refused the defendant's request to instruct the jury on voluntary manslaughter as a lesser-included offense, but did instruct the jury on second degree murder and reckless homicide. Williams, 977 S.W.2d at 104. Holding that the trial court's failure to instruct on voluntary manslaughter was harmless, the Tennessee Supreme Court drew the following conclusion:

[B]y finding the defendant guilty of the highest offense to the exclusion of the

immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

Id. at 106; see Bowles, 52 S.W.3d at 78. In this case, by finding the Defendant guilty of especially aggravated kidnapping to the exclusion of the lesser offenses, aggravated kidnapping and kidnapping, the jury necessarily rejected all other lesser offenses, including false imprisonment. Accordingly, the trial court's erroneous failure to charge false imprisonment is harmless beyond a reasonable doubt.

### 2. Aggravated Assault

Although neither the Defendant nor the State raised this issue on appeal, we conclude that the trial court committed plain error by instructing the jury that aggravated assault was a lesser-included offense of attempted second degree murder. See Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); State v. Adkisson, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994) (stating that issues which rise to the level of plain error lie within the sound discretion of the appellate court and may be considered "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice"). In Adkisson, this Court stated that the following factors should be considered by an appellate court when determining whether an error constitutes "plain error:"

> (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42 (citations omitted). We conclude that the trial court's error in instructing the jury that aggravated assault was a lesser-included offense of attempted second degree murder satisfies those five factors and, therefore, constitutes plain error.

The trial court instructed the jury as follows:

> If you have a reasonable doubt as to the defendant's guilt of Attempted Second Degree Murder as charged in Count Eleven of the indictment, then your verdict must be not guilty as to this offense. And then you shall proceed to determine his guilt or innocence of the lesser included offense of Aggravated Assault.

Any person who commits the offense of Aggravated Assault is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: Number one, that the defendant intentionally and knowingly caused bodily injury to another and that this bodily injury was, in fact, serious bodily injury, or that the defendant used or displayed a deadly weapon, or that the defendant recklessly caused bodily injury to another and that such bodily injury was serious, or the defendant used or displayed a deadly weapon. . . .

In State v. Rush, 50 S.W.3d 424 (Tenn. 2001), the Tennessee Supreme Court held that reckless aggravated assault was not a lesser-included offense of attempted second degree murder under the Burns test. Rush, 50 S.W.3d at 429-30. The Court stated that "the offense of attempted second degree murder requires proof of the following elements: (1) a knowing (2) attempt, (3) to kill another. See Tenn. Code Ann. §§ 39-13-210(a)(1) (1999) (defining second degree murder); 39-12-101 (1999) (defining criminal attempt)." Rush, 50 S.W.3d at 430. The Rush court explained:

> [U]nder part (a) of the Burns test, reckless aggravated assault cannot be a lesser-included offense of second degree murder because reckless aggravated assault requires proof of either (a) serious bodily injury or (b) bodily injury and display of a deadly weapon, neither of which is required to prove attempted second degree murder.

Id. at 430. Furthermore, the Tennessee Supreme Court concluded that part (b) of the Burns test was not satisfied. The Rush court explained:

> [T]he harm contemplated by the bodily injury element of reckless aggravated assault is not less serious than the harm contemplated by the attempted killing element of attempted second degree murder because many attempted murders do not involve any injury at all to the victim, whereas a reckless aggravated assault always involves bodily injury.

Id. at 431. Likewise, this Court has held that neither aggravated assault nor assault is a lesser-included offense of attempted second degree murder under the Burns test. State v. Hughes, No. W1999-00360-CCA-R3-CD, 2001 WL 91736, at *14 (Tenn. Crim. App., at Jackson, Jan. 26, 2001), *no perm. app. filed.* In Hughes, this Court noted that, pursuant to the statutory elements analysis mandated in Burns, "descriptive language in a charging instrument *will not create* a lesser-included offense if the statutory elements of the greater offense do not include all of the elements of the lesser offense or otherwise indicate inclusion via parts (b) or (c) of Burns." Id. at *14; see State v. Brown, No. M1999-00691-CCA-R3-CD, 2000 WL 262936 (Tenn. Crim. App., at Nashville, Mar. 9, 2000), *perm. app. denied* (Tenn. Sept. 10, 2001) (holding that assault and aggravated assault are not lesser included offenses of attempted first degree murder under the Burns analysis because the statutory elements of assault and aggravated assault are not included in the statutory elements of attempted first degree murder); see also State v. Arellano, No. M2002-00380-CCA-R3-CD, 2003 WL 535927

(Tenn. Crim. App., at Nashville, Feb. 26, 2003) *perm. app. granted* (Tenn. June 30, 2003) (holding that plain error required reversal of the defendant's conviction upon his guilty plea to aggravated assault because the defendant was originally charged with attempted first degree murder, and, under Brown, 2000 WL 262936, aggravated assault is not a lesser included offense of attempted first degree murder).

A person commits aggravated assault who "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a) (1997). Tennessee Code Annotated section 39-13-101(a) (1997) states that a person commits assault who: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." In light of Rush and Hughes, we conclude that aggravated assault is not a lesser-included offense of attempted second degree murder because it requires proof of (a) serious bodily injury or (b) use or display of a deadly weapon in connection with the assault, neither of which is required to prove attempted second degree murder, and the harm contemplated by the bodily injury element of aggravated assault is not less serious than the harm contemplated by the attempted killing element of attempted second degree murder. See Rush, 50 S.W.3d at 430-31; Hughes, 2001 WL 91736, at *14. Therefore, because the trial court committed plain error by instructing the jury that aggravated assault was a lesser-included offense of attempted second degree murder, we reverse the Defendant's conviction of aggravated assault in count eleven of the indictment.

## F. Sufficiency of the Evidence

Next, the Defendant contends that the evidence presented at trial was insufficient to support all of his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant

removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of the following offenses: one count of especially aggravated kidnapping; one count of aggravated sexual battery; five counts of aggravated rape; one count of aggravated assault as the lesser included offense of attempted second degree murder; and another count of aggravated assault.

## 1. Especially Aggravated Kidnapping

Especially aggravated kidnapping is the knowing, unlawful removal or confinement of another "so as to interfere substantially with the other's liberty," Tenn. Code Ann. 39-13-302(a) (1997), where such removal or confinement is accomplished with a deadly weapon or where the victim suffers serious bodily injury. Tenn. Code Ann. 39-13-305(a)(1) and (4) (1997). The victim stated that, after the Defendant gave her the gun and she was walking to get help from a nearby house, the Defendant tackled her from behind and took the gun away, shooting her in the knee in the process. She stated that she tried to run, but the Defendant tackled her again and put his hand over her mouth because she was screaming. She explained that the Defendant then "choked me and told me that he could kill me just by choking me." The victim further stated that the Defendant, who was still in possession of the gun, then forced her to go up a steep bank and into the woods. The victim testified that, thereafter, the Defendant forced her to walk deeper into the woods and subsequently raped her multiple times. The evidence indicated that the victim was not free to leave until the Defendant led her back to the Jeep at the "strip pits," and the Defendant clearly used a deadly weapon and caused the victim serious bodily injury during the course of the kidnapping. Accordingly, we conclude that a rational trier of fact could have found the essential elements of especially aggravated kidnapping beyond a reasonable doubt.

## 2. Aggravated Assault

A person commits aggravated assault who "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a). Tennessee Code Annotated section 39-13-101(a) states that a person commits assault who: "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." The jury convicted the Defendant of one count of aggravated assault as a lesser-included offense of attempted second degree murder for pulling the trigger of the gun while the gun barrel was inserted in the victim's vagina, and the jury convicted the Defendant on another count of aggravated assault for shooting the victim in the knee with a gun. Even though we reversed the Defendant's conviction of aggravated assault in count eleven of the indictment because we concluded that aggravated assault was not a lesser-included offense of attempted second degree murder, we will consider the sufficiency of this

-25-

conviction in the event of further review. First, the victim testified that the Defendant inserted the barrel of his gun into her vagina, told her "[t]hat he would blow my guts out" and then pulled the trigger of the gun. The evidence indicated that the victim feared imminent bodily harm from this act of inserting the gun barrel into her vagina and pulling the trigger. Accordingly, we conclude that this evidence was sufficient to support the Defendant's conviction on this count of aggravated assault. Second, the victim testified that the Defendant shot her in the knee after he tackled her, and the medical evidence confirmed that she was shot in the knee. The Defendant's act caused serious bodily injury, and he used a deadly weapon. Therefore, we conclude that sufficient evidence exists to support the Defendant's conviction on the second count of aggravated assault.

### 3. Aggravated Sexual Battery

Tennessee Code Annotated section 39-13-504(a) (1997) states that:

> Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon . . . .

The jury convicted the Defendant of aggravated sexual battery for rubbing the upper inside thigh of the victim while in possession of a gun. The victim testified that she awoke a second time at the "strip pits" because the Defendant was rubbing the inside of her thigh. She explained that the Defendant was located to her left and was holding the gun as he rubbed her thigh. The victim testified that "I woke up and started screaming." This evidence shows that the Defendant, armed with a gun, made unlawful sexual contact with the victim by force. We conclude that this evidence was sufficient for a rational jury to find the Defendant guilty of aggravated sexual battery beyond a reasonable doubt.

### 4. Aggravated Rape

Tennessee Code Annotated section 39-13-502(a) (1997) defines aggravated rape as:

> [U]nlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> (2) The defendant causes bodily injury to the victim. . . .

The jury convicted the Defendant of five separate counts of aggravated rape in the indictment, as elected by the State in the bill of particulars: count three, which stated that "[t]he defendant put a gun to [the vicim's] head and forced her to perform oral sex on him on the first occasion;" count four,

-26-

which stated that "[t]he defendant, while in possession of a gun, forced [the victim] to stand up and lean over a log while he sexually penetrated her vagina with his penis;" count six, which stated that "[t]he defendant placed the gun barrel inside [the victim's] vagina;" count seven, which stated that "[t]he defendant, while in possession of a gun, forced [the victim] to perform oral sex on him on a second occasion;" and count eight, which stated that "[t]he defendant, while in possession of a gun, sexually penetrated [the victim's] vagina with his penis." As we previously noted, the jury acquitted the Defendant of aggravated rape in counts five, nine and ten.

The victim testified that, once she and the Defendant got into the woods, "we walked a little ways, and that's when he wanted me to perform oral sex on him and I didn't want to so he put the gun against my head and then I did." The victim reported that she and the Defendant stopped at a fallen log in the woods, and the Defendant "started licking my breasts . . . and he tried to have sex with me there." She explained that the Defendant, who was carrying the gun, took her shorts and panties off while they were at the fallen log. She stated that she was lying on her back, "and he made me stand up and lean over the log and tried it that way." The victim testified that the Defendant was fully erect and penetrated her vagina with his penis, and that she thought that the Defendant "complet[ed] the sexual act" at that time. The victim testified that, after the Defendant "dropped [her] panties," "[w]e just walked more and then again, he made me perform oral sex on him when we stopped and then that's when he put his fingers in me . . . ." She testified that the Defendant was carrying the revolver the entire time he was assaulting her. The victim explained that she was on her back on the ground when he put his fingers inside of her vagina, and, after inserting his fingers, the Defendant put the barrel of the gun inside of her vagina, which caused her pain in that area. The victim testified that the Defendant forced her to have vaginal intercourse on another occasion as they walked through the woods, though she could not remember exactly where it occurred. The victim explained that, once they arrived at the top of the bank, "[the Defendant] did make me perform oral sex again until he got an erection and we had sex again there." She stated that the Defendant forced her to have sex a total of three or four times while they walked through the woods. This evidence indicates that the Defendant forced the victim to perform oral sex on him on no fewer than three occasions, forced her to have vaginal intercourse on no fewer than three occasions, and inserted his fingers and a gun barrel into the victim's vagina on another occasion. The DNA evidence showed that the Defendant's semen was present inside the victim. We conclude that the evidence was sufficient for a rational trier of fact to find the Defendant guilty of each of the five separate counts of aggravated rape, as elected by the State in the bill of particulars.

### G. Sentencing

Finally, the Defendant contends that the trial court erred in sentencing the Defendant to an effective sixty-year sentence. The trial court imposed concurrent, forty-year sentences on counts one, three, four, six, seven and eight. The trial court imposed a sentence of twenty years on count two and imposed ten year sentences on counts eleven and twelve. The trial court ordered counts one, two, three, four, six, seven and eight to run concurrent to each other, and counts eleven and twelve to run consecutively to each other and to the other convictions, for a total sentence of sixty years. Because we reverse the Defendant's conviction for aggravated assault in count eleven and dismiss

-27-

that count, the result is an effective sentence of fifty years in prison.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001); State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.

Tennessee Code Annotated section 40-35-103(1) (1997) states that:

Sentences involving confinement should be based on the following considerations: (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. . . ." Tenn. Code Ann. § 40-35-103(5). The trial court may consider enhancing and mitigating factors when determining a defendant's sentence. A trial court may order sentences to run consecutively if a defendant is charged with more than one criminal offense and it finds, by a preponderance of the evidence, that one or more of several criteria are met as set forth in Tennessee Code Annotated section 40-35-115 (1997). State v. Kern, 909 S.W.2d 5, 8 (Tenn. Crim. App. 1993). These criteria include a finding by the trial court that the defendant is a "dangerous offender." Tenn. Code Ann. § 40-35-115(b)(4). A dangerous offender is defined as one "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high . . . ." Id. In Kern, this Court held that, for a defendant to qualify as a dangerous offender,

the record must establish that:

> (1) the defendant's behavior indicates little or no regard for human life and he did not hesitate in committing a crime in which the risk to human life is high; (2) the circumstances surrounding the commission of the offense are aggravated; (3) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and his resort to criminal activity and furtherance of his anti-societal lifestyle; and (4) the aggregate length of the sentences reasonably relates to the offenses for which the defendant stands convicted.

Kern, 909 S.W.2d at 8 (citing State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991)); see State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).

In this case, after considering evidence presented at the sentencing hearing, the trial court found the following enhancement factors to be applicable to the Defendant's convictions pursuant to Tennessee Code Annotated section 40-35-114 (1997):

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense.
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community.

The trial court did not find any mitigating factors. The trial court explained:

> I will find that the defendant voluntarily released the victim alive, and I agree with the General. That is of very little consequence to this Court. . . . I don't think he should be given a great deal of credit for that, and, based on the proof that was heard in this court, it could have easily gone the other direction. It's just by . . . in reality, an act of God, so I'm not going to give that any weight at all.

The trial court found that the Defendant should serve his sentences consecutively because it determined that the discretionary grounds set forth in Tennessee Code Annotated section 40-35-115(b) were "established by the record." The trial court explained that "[t]his defendant is . . . an offender with criminal activity, with a record that indicates an extensive criminal activity, and I do believe he is terribly dangerous, based on the proof that I heard here in the courtroom and looking at the prior history. I think it's just shown a clear disregard for any . . . human life."

On appeal, the Defendant does not contest the trial court's imposition of any enhancement factors, rather he challenges the imposition of consecutive sentencing. After thoroughly reviewing the evidence presented at the sentencing hearing, we conclude that the trial court properly sentenced

-29-

the Defendant as a dangerous offender. First, the record indicates that the Defendant demonstrated little or no regard for human life and did not hesitate in committing these crimes against the victim when the risk to the victim's life was high. Second, the record indicates that there were aggravated circumstances surrounding the commission of the offenses. The Defendant threatened the life of both the victim and Wagers in the "strip pits," and he repeatedly raped the victim, even after he shot her in the knee. Also, during the course of the rapes, he inserted his gun into the victim's vagina, told her that he was going to "blow her guts out," and pulled the trigger. Moreover, the Defendant has an extensive criminal history, including prior convictions for felonious assault, aggravated robbery, carrying a concealed weapon, and escape. We conclude that confinement for an extended period of time is necessary to protect society from the Defendant's unwillingness to lead a productive life and his resort to criminal activity. Furthermore, we conclude that an aggregate fifty-year sentence reasonably relates to the offenses for which the Defendant stands convicted. Accordingly, we conclude that the trial court properly imposed consecutive sentencing in this case. In accordance with our reversal of the Defendant's conviction in count eleven, we vacate the Defendant's ten-year sentence in count eleven, resulting in an effective sentence of fifty years in prison.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we REVERSE the trial court's judgment convicting the Defendant of aggravated assault in count eleven and AFFIRM the trial court's remaining judgments , resulting in the Defendant's being sentenced to an aggregate fifty years in prison.

_____
ROBERT W. WEDEMEYER, JUDGE